IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Robert N. Creely, et al.,                          Case Nos. 3:09 CV 2879
                                                                    3:10 CV 417
                            Plaintiffs,                         3:10 CV 2200

        -vs-                                              *    *    *    *

HCR ManorCare, Inc., et al.,                       Case No. 10 CV 270

                            Defendants.            MEMORANDUM OPINION
                                                   AND ORDER_____
                    *    *    *    *
                                                   JUDGE JACK ZOUHARY
Sandra Conteh,

                            Plaintiff,

        -vs-

Atrium Centers, LLC, et al.,

                            Defendants.

## INTRODUCTION

        Before the Court are Motions for Conditional Certification in two cases seeking collective

action status under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b) (Creely Doc. Nos.

34–35; Conteh Doc. Nos. 26–29).[1]  The cases present similar issues regarding Defendant employers'

---

[1]  Citations to the record are indicated by the case name followed by the document number and page number. Documents for *Conteh v. Atrium Centers, LLC et al.*, 3:10-cv-00270-JZ (N.D. Ohio) are referred to as "Conteh"; documents for *Creely et al. v. HCR Manorcare, Inc. et al.*, 3:09-cv-02879-JZ (N.D. Ohio) and consolidated cases *Krawiec v. HCR Manorcare et al.*, 3:10-cv-00417-JZ (N.D. Ohio) and *Veksler v. HCR Manorcare, Inc. et al.*, 3:10-cv-02200-JZ (N.D. Ohio) are referred to as "Creely."

timekeeping policy of automatically deducting thirty minutes from hourly employees' timecards when the employee works more than a set number of hours (the "auto-deduct policy").  The disputes in these cases, and this Court's Opinion, add another link to the long chain of cases that have considered conditional certification for auto-deduct policy claims as a violation of the FLSA.[2]

### BACKGROUND

Defendants in these cases are operators of assisted living and skilled nursing facilities spread across multiple states.  These facilities employ a large number of hourly, non-exempt personnel, including registered nurses, licensed practical nurses, certified nursing assistants, housekeeping staff, maintenance technicians, and other patient care and administrative staff (Conteh Doc. No. 29 at 3; Creely Doc. No. 35 at 2).  Defendants had a policy of using computerized timekeeping systems, Kronos or E-Time, that were programmed to automatically deduct a thirty-minute meal period from hourly employees' timecards when an employee worked a shift of more than five or six hours (Conteh Doc. No. 29 at 5; Creely Doc. No. 35 at 4).  Under this system, employees clocked in at the beginning of their shift and clocked out at the end of their shift; they did not clock in and out for their meal break.  If an employee was unable to take an uninterrupted thirty-minute meal break, the employee was required to fill out a form and submit it to a supervisor, who would then sign it and submit it to payroll personnel.  Payroll personnel would then adjust the employee's timecard to reverse the

---

[2]

See, e.g., *Berger v. Cleveland Clinic Found.*, 2007 WL 2902907 (N.D. Ohio 2007), *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 2009 WL 1361265 (W.D. Pa. 2009), *Camper v. Home Quality Mgmt.*, 200 F.R.D. 516 (D. Md. 2000), *Carter v. Jackson-Madison Cnty. Hosp. Dist.*, 2011 WL 1256625 (W.D. Tenn. 2011), *Cason v. Vibra Healthcare, et al.*, 2011 WL 1659381 (E.D. Mich. 2011), *Colozzi v. St. Joseph's Hosp. Health Ctr.*, 595 F. Supp. 2d 200 (N.D.N.Y. 2009), *Frye v. Baptist Mem'l Hosp.*, 2010 WL 3862591 (W.D. Tenn. 2010), *Kuznyetsov v. West Penn Allegheny Health Sys., Inc.*, 2009 WL 1515175 (W.D. Pa. 2009), *Ledbetter v. Pruitt Corp.*, 2007 WL 496451 (M.D. Ga. 2007), *Lindberg v. UHS of Lakeside, LLC*, --- F. Supp. 2d ----, 2011 WL 204832 (W.D. Tenn. 2011), *Miller v. Jackson*, 2011 WL 1060737 (M.D. Tenn. 2011), *Saleen v. Waste Mgmt., Inc.*, 649 F. Supp. 2d 937 (D. Minn. 2009); *Wolman v. Catholic Health Sys. of Long Island, Inc.*, 2011 WL 1741905 (E.D.N.Y. 2011).

2

automatically deducted thirty minutes so that the employee would be properly paid for all time actually worked by the employee (Conteh Doc. No. 29 at 6; Creely Doc. No. 35 at 5).

Plaintiffs in both cases make nearly identical claims under the FLSA:  due to Defendants' implementation of the auto-deduct policy, Plaintiffs and the putative collective action members were denied statutory overtime wages in violation of the FLSA's minimum wage requirements (Creely Doc. No. 17 at 13; Conteh Doc. No. 22 at 9).  Specifically, Plaintiffs commonly allege Defendants (1) implemented a company-wide auto-deduct policy and practice for all hourly, non-exempt employees; (2) illegally shifted the burden of monitoring "compensable work time" to individual employees by requiring the employees to cancel the auto-deducted thirty minutes when they did not receive an "uninterrupted meal break;" (3) failed to train or inform the hourly employees or management as to what constitutes an uninterrupted meal break; and (4) failed to monitor or ensure that hourly employees received an uninterrupted meal break despite the automatic deduction (Creely Doc. No. 35 at vi; Conteh Doc. No. 29 at 1).

The Court heard oral argument regarding Plaintiffs' Motions for Conditional Certification in both cases, with questions provided to counsel prior to argument (Creely Doc. No. 86).  The focus of the questions at argument attempted to clarify two somewhat unique procedural considerations present in these cases.

First, while the Sixth Circuit generally uses a two-stage approach for certifying FLSA collective actions, the posture of these cases "splits the difference" between the two stages as commonly defined.  Generally, the burden at the first stage for conditionally certifying a collective action, and thereby allowing the distribution of opt-in notices, is fairly lenient and can even be met with a well-pleaded complaint prior to conducting discovery.  The second stage occurs after the opt-in

3

notices have been sent, responses received, and discovery has concluded, at which point plaintiffs must meet a much stricter standard to proceed. Based on a multi-factor review, the court may decertify the proposed conditional collective action if it cannot be shown that plaintiffs are "similarly situated." *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546–47 (6th Cir. 2006).

In both of these cases, no opt-in notices have been sent, but the parties have conducted limited discovery on the putative collective action claims. Based on these circumstances, the parties are past the first stage that requires Plaintiffs to meet the lenient standard regarding the factual basis for their allegations but are not yet to the stricter second stage at the close of the discovery and opt-in notice period. Therefore, the first task for this Court is to determine the appropriate evidentiary burden for Plaintiffs in this hybrid conditional certification scenario.

Second, Plaintiffs' evidence at this juncture focuses primarily on Defendants' implementation of auto-deduct policies, but offers little direct evidence of similar claims made by other individual employees that would support an inference that there is a group of similarly situated plaintiffs. Plaintiffs pursue a "top-down" discovery approach, instead of the more common "bottom-up" approach of finding additional representative plaintiffs to support their claims that a collective action group exists. That is, Plaintiffs deposed a number of Defendants' executives and corporate managers in an attempt to show the adoption and implementation of the auto-deduct policies were flawed generally, which in turn would implicitly suggest that there must be a group of similarly situated putative plaintiffs because the policy itself was improper in its formulation or implementation.

As a result, Defendants argue that, even if Plaintiffs have a low burden to show a similarly situated class of employees exists, Plaintiffs have failed to show there is a putative class of similarly situated individuals because the only pieces of evidence Plaintiffs have provided are their own

4

affidavits in support of the allegations in their Complaint and general evidence that Defendants implemented an auto-deduct policy, a policy which Defendants claim is not facially illegal or improper according to the Department of Labor (Conteh Doc. No. 34 at 2; Creely Doc. No. 78 at 1). Accordingly, this Court must determine whether Plaintiffs' top-down evidence is sufficient, under the to-be-determined standard mentioned above, to conditionally certify a class in each case and allow the respective Plaintiffs to distribute opt-in notices.

### FLSA CONDITIONAL CERTIFICATION STANDARD

The FLSA provides a private cause of action against an employer "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b) (emphasis added). Collective actions brought by employees under the FLSA require putative class members to opt into the action, or generally termed, the "class."[3] *See* 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."). The statutory standard for bringing a collective action under the FLSA is that the opt-in plaintiffs are "similarly situated." *Id.* "Similarly situated" does not mean plaintiffs need to be identical; however, it is plaintiffs' burden to show the claims of the putative class are similarly situated. *O'Brien v. Ed Donnelly Enter., Inc.*, 575 F.3d 567, 584 (6th Cir. 2009).

---

[3]

Though a group of plaintiffs in a collective action under the FLSA is not technically a "class" as defined under Federal Civil Rule 23, for simplicity, this Opinion uses the term "class" as a short-form reference to the putative group of opt-in plaintiffs in the proposed collective actions.

**General FLSA Certification Process**

Traditionally, courts in the Sixth Circuit follow a two-stage certification process to determine whether a proposed group of plaintiffs is "similarly situated" for the purposes of the statute's requirements. The first, or "notice" stage, takes place at the beginning of discovery with a focus on determining whether there are plausible grounds for plaintiffs' claims. If so, plaintiffs are permitted to solicit opt-in notices, under court supervision, to potential plaintiffs such as current and former employees of defendant. The second stage occurs after "all of the opt-in forms have been received and discovery has concluded." *Comer*, 454 F.3d at 546 (internal quotation and citation omitted).

The first stage is "fairly lenient," requiring only that plaintiffs show a colorable basis for their claim that a class of similarly situated plaintiffs exists. *White v. MPW Indus. Serv., Inc.*, 236 F.R.D. 363, 366–67 (E.D. Tenn. 2006) (internal citations omitted); *Olivo v. GMAC Mortg. Corp.*, 374 F. Supp. 2d 545, 548 (E.D. Mich. 2004). Some courts have held that this burden can be met solely upon allegations in the complaint, *Belcher v. Shoney's, Inc.*, 927 F. Supp. 249, 251 (M.D. Tenn. 1996) (citation omitted), while others have required a "modest factual showing." *Pritchard v. Dent Wizard Int'l Corp.*, 210 F.R.D. 591, 595–96 (S.D. Ohio 2002) (quotation and citation omitted).

On the other hand, the second-stage review is understandably more stringent as it occurs after the receipt of completed opt-in notices and completed discovery. At this point, the court considers all the evidence, in conjunction with the demographic data of the putative opt-in plaintiffs, to determine whether the assembled class is sufficiently "similarly situated" to continue as a collective action or whether the putative class should be "decertified," leaving plaintiffs free to pursue their claims on an individualized basis. The primary factors considered in a second-stage analysis are: (1) the disparate factual and employment settings of the individual opt-in plaintiffs; (2) the various

6

defenses available to defendants with respect to individual plaintiffs; and (3) fairness and procedural considerations. *Olivo*, 374 F. Supp. 2d at 548 n.2 (citing *Vaszlavik v. Storage Tech. Corp.*, 175 F.R.D. 672, 678 (D. Colo. 1997)).

### Beyond the Two-Stage Certification Process

However, when the parties have been permitted to conduct some limited discovery to determine whether a class of similarly situated plaintiffs may exist, such as in the cases before this Court, courts have had a difficult time elucidating an intermediate, or hybrid, standard that falls between the lenient first-stage and the strict second-stage review.  In their briefing and in argument, Plaintiffs urge the Court to hew closely to the lenient standard used in a first-stage analysis while Defendants advocate a higher hurdle than simply a "modest factual showing."

Some courts have approached this intermediate standard by improvising, requiring more than just the pleadings and plaintiffs' affidavits, "hold[ing] plaintiffs to a higher standard of proof." *Jimenez v. Lakeside Pic-N-Pac, L.L.C.*, 2007 WL 4454295, at *2 (W.D. Mich. 2007).  What this higher standard of proof is, and what should be considered by this Court, remains unclear.  Some courts, such as in *Jimenez*, appear to restate the "modest factual showing" standard, stating the court would review the pleadings, affidavits, and "evidence gleaned through discovery," in an attempt to "assure that there is *some factual basis* for plaintiffs' claims" before allowing plaintiffs to send opt-in notices.  *Id.* at *3 (emphasis added).

A California district court summarized three different intermediate approaches for courts in circuits that follow a two-stage certification process.  *Kress v. PricewaterhouseCoopers, LLP*, 263 F.R.D. 623, 628 (E.D. Cal. 2009).  The court in *Kress* noted some courts have held the lenient standard does not apply when evidence is available, citing two cases for the proposition that when the

parties have completed "substantial discovery," the court may proceed directly to the second stage. *Kress*, 263 F.R.D. at 628 (citing *Pfohl v. Farmers Ins. Grp.*, 2004 WL 554834, at *1, *3 (C.D. Cal. 2004) and *Basco v. Wal-Mart Stores, Inc.*, 2004 WL 1497709, at *4 (E.D. La. 2004)).  Other courts have held that when significant evidence is available, an intermediate standard applies.  *Kress*, 263 F.R.D. at 628 (citing *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1274 (M.D. Ala. 2004)).  The intermediate standard "departed from the lenient notice stage standard by considering defendant's evidence in addition to plaintiff's affidavits and allegations, but the court explicitly . . . did not weigh the evidence." *Kress*, 263 F.R.D. at 628.  The third approach, similar to the court in *Jimenez* above, simply rejects the lenient standard without invoking the second stage or articulating an alternative. *Kress*, 263 F.R.D. at 628–29 (citing *Davis v. Charoen Pokphand (USA), Inc.*, 303 F. Supp. 2d 1272, 1276 (M.D. Ala. 2004); *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1313 n.2 (M.D. Ala. 2002); *Ray v. Motel 6 Operating, Ltd. P'ship*, 1996 U.S. Dist. LEXIS 22565 (D. Minn.1996)).

One district court in Kansas, in a situation where the parties had conducted three months of discovery and thirty individuals had filed opt-in consent forms, explained that plaintiffs were clearly beyond the "notice" stage but the record was not sufficiently developed to permit an analysis under the higher standard used after discovery was complete. *Thiessen v. Gen. Elec. Capital Corp.*, 996 F. Supp. 1071, 1080–81 (D. Kan. 1998).  The court thus adopted a somewhat confusingly termed "intermediate approach" to analyze the "similarly situated" issue where: "[t]o the extent the record has been developed, the court incorporates an analysis of the relevant factors found in post-discovery cases.  The court actually makes its determination to provisionally certify, however, under a more lenient standard in light of deficiencies in the record." *Id.* at 1081.  The court then went on to consider the three primary factors traditionally used under the more strict second-stage analysis to determine

8

if there is a "similarly situated" class: (1) whether there are disparate factual and employment settings; (2) defenses available to defendants; and (3) fairness and procedural considerations. *Id.* at 1081–84. Though not explicit in its analysis, it appears the *Thiessen* court was attempting to overlay the lenient factual showing typically required under a first-stage analysis on top of the more stringent second-stage analysis factors.

Even sister district courts in this Circuit seem unable to agree on a common explanation of an intermediate standard. The court in *Bowman v. Crossmark, Inc.*, 2010 WL 2837519 (E.D. Tenn. 2010), considering the parties' "considerable discovery" when making a conditional certification decision, stated: "a more demanding standard is applied after considerable discovery has been conducted, and this review standard includes a consideration of the factors employed at the second or decertification stage of the analysis." *Id.* at *5. Yet despite this statement, the court's discussion of a more demanding standard is dicta because the court held that plaintiffs failed to meet even the lenient first-stage standard. *Id.* at *6.

In contrast, the court in *Olivo v. GMAC Mortg. Corp.*, 374 F. Supp. 2d 545, 548 n.1 (E.D. Mich. 2004), required only a modest factual showing despite having evidence from a period of limited discovery. Similar to the cases before this Court, the court in *Olivo* "afforded Plaintiffs a period of discovery solely on the issue of whether or not this action should proceed as a collective action." *Id.* The court went on to state: "Accordingly, the Court requires Plaintiffs to demonstrate 'modest' factual support for the class allegations in Plaintiffs' Complaint, rather than allow Plaintiffs to simply rely upon the allegations contained in their Complaint." *Id.* In order to meet this standard, plaintiffs "must simply 'submit evidence establishing at least a colorable basis for their claim that a class of "similarly situated" plaintiffs exists'" and the court considers "whether potential plaintiffs were identified;

whether affidavits of potential plaintiffs were submitted; . . . whether evidence of a widespread [] plan was submitted[,] . . . and whether a manageable class exists." *Id.* at 548 (internal citations omitted). Despite the lenient standard, the court in *Olivo* ultimately held that plaintiffs were not eligible for conditional certification based upon a statutory outside-sales exemption defense that prevented plaintiffs from demonstrating a common policy or plan. *Id.* at 551.

Adding one more voice to the discussion, a Michigan district court stated: "Where the plaintiffs have been afforded discovery on the issue of whether or not the action should proceed as a collective action, courts typically apply a more restrictive, but still lenient standard, requiring the plaintiffs to demonstrate at least 'modest' factual support for the class allegations in their complaint." *Pacheco v. Boar's Head Provisions Co., Inc.*, 671 F. Supp. 2d 957, 960 (W.D. Mich. 2009) (citing *Jimenez*, 2007 WL 4454295; *Olivo*, 374 F. Supp. 2d 545). The parties in *Pacheco* had been granted a period of limited discovery focused on the issue of certification. Using this "more restrictive, but still lenient standard," the court in *Pacheco* indicated it would "base its certification determination on the evidence rather than the pleadings. The Court will consider whether there is evidence of a widespread discriminatory plan, and whether, as a matter of sound case management, a manageable class exists." *Id.*

Tellingly, other courts that have considered *Pacheco*, in cases involving the conditional certification question after the parties had conducted limited discovery, are unable to agree on whether *Pacheco* requires only a lenient, first-stage modest factual showing or a more rigorous combined first and second-stage showing. *Compare Cunningham v. Elec. Data Sys. Corp.*, --- F. Supp. 2d ----, 2010 WL 5076703, at *5–7 (S.D.N.Y. 2010) (reviewing cases, including *Pacheco*, from district courts in various circuits that have considered whether to use a first or second-stage analysis for conditional

10

certification following limited discovery), *with Shockey v. Huhtamaki, Inc.*, 730 F. Supp. 2d 1298, 1305 (D. Kan. 2010) (stating that the court in *Pacheco* appeared to "collapse[] the two-step analysis and applied both steps simultaneously, even weighing the evidence and making credibility determinations"). The combination of a lenient first-stage standard combined with limited discovery led the court in *Cunningham* to apply the first-stage test until at least the completion of fact discovery, stating that the court would "apply the more lenient first-stage test, although it will consider the evidence obtained in discovery and submitted by both parties in that analysis." *Cunningham*, 2010 WL 5076703, at *7; *see also Gortat v. Capala Bros., Inc.*, 2010 WL 1423018, at *10 (E.D.N.Y. 2010) (considering conditional certification after some discovery had taken place, the court refused to apply the second-stage standard, stating: "The heightened scrutiny standard is only appropriate after the opt-in period has ended and the court is able to examine whether the actual plaintiffs brought into the case are similarly situated.").

### A Hybrid Standard Between Stages One and Two

Thus, despite the numerous courts that have dealt with this issue, the question remains -- what is the standard this Court should apply in deciding whether to conditionally certify the proposed classes when the parties have conducted several months of limited discovery on the certification issue?

As a start, it is helpful to summarize several observations from the above cases. First, courts generally agree that allowing the parties to conduct some targeted discovery regarding the conditional certification question takes the question beyond the stage one evidentiary boundaries of the complaint's allegations and supporting affidavits. *See Pacheco*, 671 F. Supp. 2d at 960. Second, once beyond the stage one evidentiary boundaries, the courts should consider the evidence produced by

plaintiff and defendant with the explicit acknowledgment that the body of evidence is necessarily incomplete. *See Kress*, 263 F.R.D. at 629. Third, when reviewing the assembled evidence, the court's analysis is confined to evaluating whether the proposed class is "similarly situated" and does not touch upon the merits of plaintiffs' claims. *See Olivo*, 374 F. Supp. 2d at 548; *Brabazon v. Aurora Health Care, Inc.*, 2011 WL 1131097, at *4 (E.D. Wis. 2011) ("[T]he conditional certification inquiry should not delve into the merits of a plaintiff's claim.") and *O'Brien*, 575 F.3d at 585 (analysis is primarily focused on the "unified [] common theories of defendants' statutory violations," even if the proof of these theories may be individualized and distinct and without the court evaluating the merits of the alleged statutory violations at this conditional certification juncture). And fourth, litigation and judicial efficiency concerns would point toward the court considering, but not requiring plaintiffs to show, the factors commonly considered under stage two in performing a "similarly situated" analysis, resolving any gaps or doubts in the evidence in favor of plaintiffs based upon the incomplete, although potentially substantial, factual record in light of the equitable goals and policies embodied in the FLSA. *See Kress*, 263 F.R.D. at 629 (citing *Leuthold v. Destination Am., Inc.*, 224 F.R.D. 462, 467–68 (N.D. Cal. 2004), a lengthy and well-reasoned review of the reasons for plaintiff's low burden prior to the second-stage analysis after discovery has closed and the opt-in notices have been returned).

Using these general propositions, this Court believes that a hybrid standard, similar to the one envisioned by the court in *Thiessen*, which combines the lenient standard with some consideration of the stage-two factors, and is augmented by the practical considerations mentioned by other district courts, strikes the proper balance between the traditional stage-one and two standards. Accordingly, this Court will consider the evidence submitted by both parties but, because the cases have not yet

progressed to stage two and the Court only has an incomplete factual record, it is appropriate to require Plaintiffs to make a modest "plus" factual showing that there is a group of potentially similarly situated plaintiffs that may be discovered by sending opt-in notices.

However, in order to provide some measurable standard by which to judge if Plaintiffs have made a sufficient modest "plus" factual showing, and to prevent the absurd result of granting the parties time to do discovery on the conditional certification question but subsequently imposing no incremental hurdle in determining whether Plaintiffs may send opt-in notices, this Court will compare Plaintiffs' allegations set forth in their Complaint with the factual record assembled through discovery (Doc. Nos. 34–69) to determine whether Plaintiffs have made sufficient showing beyond their original allegations that would tend to make it more likely that a class of similarly situated employees exists. In other words, the Court will review whether Plaintiffs have advanced the ball down the field -- showing that it is more likely that a group of similarly situated individuals may be uncovered by soliciting opt-in plaintiffs.  And, because the Court will continue to use a lenient standard, Plaintiffs need not have moved the ball far down the field, but they need to have shown some progress as a result of the discovery as measured against the original allegations and defenses.

How much progress Plaintiffs have made will be considered in conjunction with Defendants' evidence and in the context of Plaintiffs' unshifting burden to prove their claims.  However, the Court does not weigh the relative merits of the parties' claims at this conditional certification stage.  A full and complete merit review of both sides' arguments is best preserved for the detailed and strict review conducted at stage two, when the Court and the parties have the benefit of a fully developed factual record.

**Parties' Arguments Regarding the Applicable Standard**

Having set forth the above standard, a few comments are necessary to address the parties' arguments with respect to the standard relevant to these pending cases.  First, Plaintiffs argue that it would be inconsistent for this Court to now require Plaintiffs to produce evidence beyond the lenient, or modest factual showing, traditionally required for initial certification when the agreement between the parties was predicated on conducting limited discovery in express anticipation of *conditional* certification (Creely Doc. No. 79-1 at 5).  In *Creely* and *Contech*, the parties were explicitly given three-plus months to conduct limited discovery regarding class certification (Creely Doc. No. 16 at 2–3; Conteh Doc. No. 16 at 2).

Based on the standard announced above, this Court believes Plaintiffs' concerns have been adequately addressed and there has been no "bait and switch" such that the Court is now requiring Plaintiffs to meet a higher-than-expected standard.  The standard against which Plaintiffs' evidence will be evaluated remains lenient, with the burden focused on advancing their own original allegations of a sufficiently similar class, not on refuting Defendants' arguments and defenses.  On the other hand, it is certainly no surprise to Plaintiffs that when this Court specifically grants the parties time for the purpose of conducting limited discovery, that this Court will require Plaintiffs to make some small showing that advances their claims and pushes the proverbial ball down the field.  If there was no expectation of advancing Plaintiffs' claims, the entire exercise of limited discovery would be meaningless.  Plaintiffs must provide the Court with some additional evidence, even a small amount, that would tend to make it more likely that a similarly situated class exists.

On the other hand, Defendants argue a lenient standard or a modest factual showing is not a sufficiently high hurdle for Plaintiffs to overcome considering the several months spent on limited

14

discovery regarding the conditional certification question.  This Court finds Defendants' arguments without merit.  Defendants appear to fault Plaintiffs for not moving for initial notice promptly enough and therefore argue Plaintiffs forfeited their right to have their claims reviewed under the lenient standard (Creely Doc. No. 78 at 17).  While Plaintiffs may not have immediately moved for preliminary notice, the parties *jointly* agreed to conduct a period of limited discovery -- Defendants cannot now turn that mutual agreement into a sword to use against Plaintiffs by faulting them for not moving for conditional certification earlier.

The *Creely* Defendants also cite two cases, *Basco v. Wal-Mart Stores, Inc.*, 2004 WL 1497709 (E.D. La. 2004), and *Pfohl v. Farmers Ins. Grp.*, 2004 WL 554834 (C.D. Cal. 2004), that purportedly impose the heavier stage-two burden on the respective plaintiffs after they were granted time to conduct limited discovery on the conditional certification issue (Creely Doc. No. 78 at 17).  The *Conteh* Defendants argue a similar proposition, albeit less vigorously (Conteh Doc. No. 34 at 5). However, neither cited case is from a court in this Circuit and even other courts in the respective circuits of *Basco* and *Pfohl* have refused to follow those holdings by imposing a higher burden on plaintiffs after a period of discovery.  *See, e.g.*, *Kress*, 263 F.R.D. at 629 ("With the exception of *Pfohl*, the court is not aware of any district court within the Ninth Circuit to have followed these cases [imposing a second-stage analysis following limited discovery]. Courts within this circuit instead refuse to depart from the notice stage analysis prior to the close of discovery.")  This Court's review of these cases and the citation history of these cases also shows that a number of courts have declined to follow or have distinguished these cases with respect to their imposition of a higher burden on plaintiffs.

Defendants next argue that Plaintiffs should have to meet a higher standard and the Court should require more than a "handful of affidavits that support [Plaintiffs'] position" (Creely Doc. No. 78 at 17). *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1313 n.2 (M.D. Ala. 2002). That is precisely what this Court is requiring of Plaintiffs under the standard described above. While Plaintiffs have filed their own personal affidavits in moving for conditional certification, the Court is reviewing the numerous other exhibits filed in support of the Motions to determine whether Plaintiffs have provided any factual support beyond their own statements and the allegations in their respective Complaints (*see* Creely Doc. Nos. 34–69; Conteh Doc. Nos. 28–30, 34, 35).

Lastly, HCR Manorcare, Inc. ("HCR") attempts to raise arguments that Plaintiffs' proposed class is unmanageable or that there are too many location-specific nuances to account for in a collective action (Creely Doc. No. 78 at 7–12). These arguments are premature. Even under the hybrid standard above, the Court is simply making a determination on whether there is enough evidence to support sending out notifications to a potential similarly situated opt-in class. The arguments regarding whether the collective action opt-in group is manageable or whether individual issues predominate are properly addressed under the more stringent stage-two analysis. *See Olivo*, 374 F. Supp. 2d at 548 n.2 (defining the stage-two considerations as: (1) the disparate factual and employment settings of the individual opt-in plaintiffs; (2) the various defenses available to defendants with respect to the individual plaintiffs; and (3) fairness and procedural considerations). A stage-two analysis, after all of the opt-in plaintiffs have been identified, will be the proper time for HCR to renew arguments about the variations among its facilities and staffing.

16

**ANALYSIS OF PLAINTIFFS' EVIDENCE**

**I.     CREELY V. HCR MANORCARE, INC.**

**Introduction**

Defendant HCR is a nationwide provider of short- and long-term medical and rehabilitation care.  HCR provides care through its operation of more than three hundred facilities under several trade names, employing roughly 44,000 non-exempt hourly employees (Creely Doc. No. 78 at 1). HCR's facilities are generally organized into two divisions -- assisted living and skilled nursing (*id.*). Between these two divisions and the specific population served by each specific facility, individual HCR facilities may have widely varying resident populations, staffing needs, and contractual and legal requirements (*id.* at 2).  However, HCR develops company-wide policies, including compensation and training, at its headquarters in Toledo, Ohio; each facility also has its own local management team and human resources support personnel responsible for implementing and complying with the HCR corporate policies (*id.*).

Plaintiffs Robert Creely and Diane Krawiec were non-exempt hourly employees at HCR's facility, HCR Manor Care Services -- Yardley, in Yardley, Pennsylvania (Creely Doc. No. 17 at 4). Creely also worked at HCR's facility in Huntingdon Valley, Pennsylvania (Creely Doc. No. 36 at 1). Both Creely and Krawiec worked as licensed practical nurses ("LPNs") (Creely Doc. No. 35 at 8–9). Plaintiff Alina Veksler was a non-exempt hourly employee at HCR's facility in Northbrook, Illinois. Veksler first worked for HCR as a Business Office Manager and later as an Admissions Coordinator (*Veksler v. HCR Manorcare, Inc.*, 3:10-cv-2200-JZ (N.D. Ohio), Original Complaint, Doc. No. 1 at 3).  Creely and Krawiec filed their Complaint in this Court; Veksler filed her Complaint in the Northern District of Illinois.  Through a joint motion by all Plaintiffs and Defendants, the cases were

17

consolidated before this Court because the Complaints alleged the same basic violations of the FLSA (Creely, Doc. No. 30).

### Creely Plaintiffs' Allegations

In light of the conditional certification standard set forth above, the Court's analysis begins with Plaintiffs' allegations.  The primary basis for Plaintiffs' Complaint is HCR's use of a policy that automatically deducted a thirty-minute meal break from hourly employees' timecards when an employee worked a shift of more than a certain length (the "Automatic Meal Break Deduction Policy") (Creely Doc. No. 17 at 6).  HCR implemented this policy through the use of a computerized timekeeping system, Kronos, in each of its facilities and all HCR non-exempt hourly employees are subject to the Meal Break Deduction Policy (*id.*).  If an employee was unable to take an uninterrupted thirty-minute meal break, the employee was responsible for submitting a "missed punch" form to the employee's supervisor for a signature.  The supervisor would then submit the form and payroll personnel would reverse the thirty-minute deduction for that employee.

Plaintiffs allege this auto-deduct meal break process improperly and illegally shifts the burden to employees to ensure "non-qualifying" meal breaks  (i.e. meal breaks of less than thirty minutes or interrupted meal breaks) are not deducted from their pay (*id.* at 7).  Plaintiffs also allege HCR has failed to properly train hourly employees or their managers as to what constitutes an uninterrupted meal break (Creely Doc. No. 35 at vi).

Plaintiffs allege HCR implemented a corporate policy that violated the FLSA in four basic ways (Creely Doc. No. 17 at 6–8):

- Automatically deducting thirty-minute meal breaks from all hourly employees' timecards, regardless of whether the employee performed compensable work during his or her meal break;

18

- Improperly shifting the burden of monitoring "compensable work time" to employees by requiring employees to individually alert HCR management when the employee did not receive an uninterrupted meal break;

- Failing to train hourly employees or their managers on what constitutes an "uninterrupted meal break" under the FLSA; and,

- Failing to instruct or require managers to monitor if hourly employees were unable to take an uninterrupted meal break.

Before considering the factual support submitted by Plaintiffs, it is worth noting that Plaintiffs' Complaint differs from many other FLSA auto-deduct cases. Plaintiffs' claims in this case are not the same as the policy-to-violate-the-policy claims that have appeared in many other FLSA cases. *See, e.g.*, *Saleen v. Waste Mgmt., Inc.*, 2009 WL 1664451, at *5 (D. Minn. 2009) ("Plaintiffs' offer of proof in support of their motion appears to advance the theory that [the employer's] *enforcement* of the automatic-deduction policy created a policy-to-violate-the-policy.") (emphasis added). Instead, Plaintiffs' argument appears to be that while the basic tenet of HCR's meal-break policy, the thirty-minute auto-deduction, is not improper *per se*, HCR's method of *implementing* the policy is the essence of Plaintiffs' Complaint. Therefore, this Court's review will focus on whether Plaintiffs' top-down discovery approach has produced sufficient facts to advance their claims that HCR failed to properly implement the auto-deduct policy such that this Court should grant conditional certification of the proposed collective action.

### Creely Plaintiffs' Factual Support

This Court has reviewed the voluminous set of documents, comprising thirty-three docket entries, produced by Plaintiffs in support of their Motion (Creely Doc. Nos. 36–69), and, for convenience, has grouped the materials into three main categories. These are: (1) Plaintiffs'

19

Declarations and depositions, (2) depositions of various HCR personnel, and (3) internal HCR documents regarding the auto-deduct policy.[4]

### *Plaintiffs Testimony*

The first set of documents submitted in support of Plaintiffs' allegations are declarations submitted by named Plaintiffs Creely, Krawiec, and Veksler, along with deposition transcripts of Creely and Krawiec (Creely Doc. Nos. 36–38, 45–46).  Many of these statements affirm or restate the basic allegations of the Complaint -- namely, all hourly employees were subject to the auto-deduct policy, all hourly employees were subject to the deduction whether or not they received an uninterrupted thirty-minute meal break, and that Plaintiffs had been required to work through their meal breaks and were not properly compensated (*see* Creely Doc. No. 36 at 3–4, 6; Doc. No. 37 at 2; Doc. No. 38 at 2).

Of greater interest to this Court's analysis are other aspects of Plaintiffs' declarations that might support Plaintiffs' claims that the auto-deduct policy constituted a "unified [] common theor[y]" of HCR's alleged FLSA violations.  *O'Brien*, 575 F.3d at 585.  Specifically, Plaintiffs' declarations allege:

---

[4]

Plaintiffs' Memorandum is far from "user-friendly," particularly considering the amount of discovery materials provided in support of their argument.  By its very nature, a determination of whether to conditionally certify a collective action class is fact-intensive.  However, Plaintiffs' Memorandum fails to connect the factual bases with their legal arguments.  Instead, Plaintiffs recite numerous "Pertinent Facts," with copious citations to the record, in pages 1–8 of the Memorandum; then present their legal arguments as to why the Court should grant conditional certification on pages 10–16, replete with numerous case citations, but *zero* citations to the factual record.  It is left to the Court to connect the dots -- to search for which facts support which allegations -- to evaluate Plaintiffs' base conclusion: "Plaintiffs have offered sufficient evidence . . . for this Court to authorize notice." (Creely Doc. No. 35 at 12).

- Plaintiffs regularly worked through their meal breaks and had their meal breaks interrupted and were not compensated for this time due to the auto-deduct policy; Plaintiffs witnessed that other employees also regularly worked through their meal breaks or had their meal break interrupted (Creely Doc. No. 36 at 3; Doc. No. 37, at 2, 5–6);

- HCR does not have a policy to ensure employees are receiving the allotted thirty-minute meal break despite subjecting all hourly employees to the auto-deduct policy (Creely Doc. No. 36 at 2; Doc. No. 37 at 2, 4);

- HCR fails to relieve employees from their duty station to allow them to take an uninterrupted meal break, often requiring employees, including Plaintiffs, to eat at their duty station and on occasion not being able to eat at all during their shift (Creely Doc. No. 37 at 3);

- Plaintiffs and other hourly employees believed that they could only submit a form to cancel the auto-deduction if they had no opportunity at all to eat a meal (Creely Doc. No. 36 at 2);

- HCR employees, including Plaintiffs, regularly ate their meal at their desks while working (Creely Doc. No. 36 at 2; Doc. No. 37 at 4; Doc. No. 38 at 2);

- HCR employees considered themselves to have taken a meal break if they were able to take a five to ten minute break (Creely Doc. No. 36 at 2);

- Plaintiffs informed their supervisors that they were not receiving their meal breaks (Creely Doc. No. 36 at 3);

- Supervisors told Plaintiffs that turning in missed punched forms for missing meal breaks was not encouraged and that forms might get rejected (Creely Doc. No. 36 at 3);

- Supervisors observed and knew that Plaintiffs and other hourly employees were routinely working through their meal breaks (Creely Doc. No. 38 at 2; Doc. No. 37 at 4–5; Doc. No. 36 at 4);

- HCR's failure to properly staff work shifts resulted in employees continuing to work after clocking out and supervisors knew that employees would have to work through their meal breaks to accomplish all assigned tasks (Creely Doc. No. 36 at 4; Doc. No. 37 at 3–5);

21

- Cancellations of missed meal breaks by employees are not common because it is HCR's policy that if the employee gets even a short break to eat, then that employee was considered to have a meal break; employees are also regularly not compensated for interrupted meal breaks (Creely Doc. No. 36 at 5);

The case law regarding the weight this Court should attribute to Plaintiffs' declarations in support of their claims is, at best, mixed.  On one hand, some courts have held such declarations, in which the named plaintiffs witnessed or believed other employees worked through their meal breaks without receiving compensation, do not help meet the burden of showing a class of similarly situated employees exists.  *Landsberg v. Acton Enters.*, 2006 WL 3742221, at *3 (S.D. Ohio 2006) (holding that speculation that other employees working under other supervisors were not properly paid is insufficient to justify notice to the class).

On the other hand, other courts have held that such affidavits or declarations, even when they contain assertions about other employees' experiences, in conjunction with a factually detailed complaint, are sufficient to conditionally certify a collective action.  *See Carter v. Jackson-Madison Cnty. Hosp. Dist.*, 2011 WL 1256625, at *16–17 (W.D. Tenn. 2011) ("[T]he Court finds that the factually-detailed complaint, affidavit and consent form of the named plaintiff, and affidavits and consent forms of two additional employees of the Defendant are sufficient to make a 'modest factual showing' that [named plaintiff] is similarly situated to prospective class members. . . . [T]he Court need not decide this unsettled issue [whether the plaintiffs' affidavits contain inadmissible evidence about the experiences of other employees] because it is convinced that the [three employee-plaintiff] affidavits present admissible evidence based on their own personal knowledge.") (citations omitted).

This Court finds Plaintiffs' declarations are more akin to supplemental pleadings, and do little to advance the claims in the Complaint.  Many of the statements in the declarations simply reiterate or give slightly more color to the primary claims advanced by Plaintiffs -- namely that HCR

22

implemented the auto-punch policy, some coworkers were not properly compensated under the policy, and HCR managers knew, or should have known, that hourly employees may not have been properly compensated.

### HCR Testimony

The second set of materials considered by the Court are the deposition transcripts of various managers and executives of HCR.  Because of Plaintiffs' decision to pursue a top-down discovery approach, this is where the Court would expect the proverbial meat of Plaintiffs' support for their claims.  And on this point, Plaintiffs are successful.

Plaintiffs submit testimony from the following individuals:

- Tammy Barker, Assistant Vice President of Quality Support Services (Creely Doc. No. 39);

- Mary Brownell, Corporate Paralegal (Creely Doc. No. 40);

- Pauline Coram, Director of Executive Learning (Creely Doc. No. 41);

- Ronnie England, Jr., Director of Compensation and Human Resources Systems Support (Creely Doc. No. 42);

- Kathleen Hutchison, Director of Safety and Human Resources Operations Support (Creely Doc. No. 43); and,

- Gary Mierzwiak, Director of Information Technology (Creely Doc. No. 44).

Each of these individuals was designated by HCR under Federal Civil Rule 30(b)(6) to testify regarding matters within that individual's particular bailiwick as a representative for HCR's corporate policies.  This Court will highlight the relevant supporting facts from the depositions as they relate to Plaintiffs' claims.

First, the testimony supports Plaintiffs' claims that HCR implemented a company-wide policy to automatically deduct thirty-minute meal breaks from all hourly employees' timecards, adding credence to Plaintiffs' claim that a group of similarly situated employees exists across many of HCR's facilities.

Based on the testimony of England, HCR's Director of Compensation, HCR implemented the auto-punch policy in 2004 (Creely Doc. No. 42 at Tr. 103–04).  The auto-punch policy was implemented at HCR skilled nursing and assisting living facilities nationally, with the exception of facilities in California and Wisconsin, covering 44,000 employees (*id.* at Tr. 108–11, 127–28).  The "vast majority" of all those employees, with the exception of approximately a dozen senior officers, are employed by Heartland Employment Services, LLC, a wholly-owned subsidiary of HCR (Creely Doc. 40, at Tr. 9–10).  If a particular HCR facility did not implement the auto-deduct policy, that would have been in contravention of HCR's nationwide policy (Creely Doc. No. 42 at Tr. 110–11).

England also confirmed that it was ultimately the employee's responsibility to alert payroll if the employee had not received a meal break and therefore should be compensated.  An employee who missed a meal break would fill out a punch form and submit it to a supervisor for a signature, and the form would then be given to payroll to correct the employee's timecard to reflect the missed meal break (Tr. 145–47).  For reasons not clear from the record, HCR changed the auto-deduct policy in 2010, allowing an hourly employee to indicate directly on the timeclock, when clocking out, whether or not the employee received a meal break, eliminating use of the punch form (Creely Doc. No. 43 at Tr. 41–42; Creely Doc. No. 42 at Tr. 180–82).

While this testimony supports Plaintiffs' claim that a similarly situated class of collective action members exists among HCR's hourly employees, it is not enough, standing alone, to permit

24

conditional certification.  As argued by HCR, and recognized by other courts, "simple allegations of the existence and implementation of a practice of making automatic deductions for scheduled meal breaks in and of itself is not 'sufficient as a common denominator to permit a collective action' on behalf of all [employees] subject to the practice." *Brabazon*, 2011 WL 1131097, at *3 (citing *Fengler v. Crouse Health Found., Inc.*, 595 F. Supp. 2d 189, 195 (N.D.N.Y. 2009).  *See also* Wage and Hour Division, U.S. Dep't of Labor, Fact Sheet No. 53, The Health Care Industry and Hours Worked (2009), *available at* http://www.dol.gov/whd/regs/compliance/whdfs53.pdf).

Second, the testimony supports Plaintiffs' contentions that HCR improperly shifted the burden of monitoring "compensable work time" to employees.  England, Hutchison, and Mierzwiak all testified consistently, with slight variations based on their respective knowledge, that the employee is responsible to keep track of and notify HCR when they have worked off the clock (see Creely Doc. No. 42 at Tr. 145–48, 151–55; Doc. No. 43 at Tr. 44–46, 49–53; Doc. No. 44 at Tr. 15–17).  England also testified that supervisors, even when they know that an employee has missed a meal break, are not instructed to initiate an action to cancel the automatic thirty-minute deduction from the employee's timecard.  He "would hope as a supervisor that that would be something that would be in their scope" (Creely Doc. No. 42 at Tr. 155).  Furthermore, in his role as Director of Compensation for HCR, England stated HCR does not track or keep data on whether employees are being compensated properly (Tr. 157–60).

Some courts have held that employers cannot shift this burden of monitoring compensable time to employees.  "The law is clear that it is the employer's responsibility, not its employees', to ensure compensation for work 'suffered or permitted.'" *Camesi*, 2009 WL 1361265, at *4 (citing *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 288 (2d Cir. 2008) ("[a]n employer who has [actual or

constructive] knowledge that an employee is working, and who does not desire the work [to] be done, has a duty to make every effort to prevent its performance," and "[t]his duty arises even where . . . the employee fails to report his . . . hours")); *Lindberg*, 2011 WL 204832, at *6 (citing *Colozzi v. St. Joseph's Hosp. Health Ctr.*, 595 F. Supp. 2d 200, 206–07 (N.D.N.Y. 2009)).

Third, testimony from England supports Plaintiffs' claim that HCR failed to train hourly employees or their managers on what constitutes an "uninterrupted meal break." HCR deliberately chose not to provide specific training regarding an "uninterrupted meal break," preferring instead to let hourly employees decide for themselves whether they had received an uninterrupted meal break (Creely Doc. No. 42 at Tr. 130–32) ("the interrupted versus uninterrupted is going to be the employee's opinion"). Also, supervisors' training did not include what it means for employees to receive an uninterrupted meal break (Tr. 125–26). Instead, HCR was purposely vague on what constituted a proper meal break under the FLSA, in order to allow both individual employees and individual HCR facilities to define an uninterrupted meal break (Tr. 126–28) ("Actually, I wanted the unique facilities and the individuals who were part of the automatic meal break deduction to define [what constitutes an uninterrupted meal break] themselves.").

HCR's approach however is not supported by the plain language of the Department of Labor Fact Sheet on auto-deduct policies or the federal regulations under the FLSA. Both are explicit in requiring an uninterrupted meal break period, not a flexible standard to be determined at will by an employer or an employee. *See* Dep't of Labor, Fact Sheet No. 53, at 3 ("[T]he employees must be completely relieved from duty."); 29 C.F.R. § 785.19(a) ("The employee must be completely relieved from duty for the purposes of eating regular meals. . . . The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating."). England's statements that HCR

26

intentionally refused to train employees on what constituted an uninterrupted meal break, and that such refusal was undertaken with respect to the entire hourly employee population subject to the auto-deduct policy, sufficiently supports and advances Plaintiffs' allegations on this point.

Fourth and finally, the depositions support the claim that HCR did not ensure hourly employees were receiving an uninterrupted meal break.  Wage and Hour Division, U.S. Dep't of Labor, Fact Sheet No. 53, at 3 ("[T]he employer must ensure that the employees are receiving the full meal break.").

When asked about supervisors' roles as it relates to making sure employees either receive uninterrupted meal breaks or fill out a missed punch form, Assistant Vice President Barker testified that supervisors are not specifically required to verify whether employees receive their break (Creely Doc. No. 39 at Tr. 29–34).  Instead, the supervisor's broadly defined role might include simply reminding employees to fill out the punch form as needed, but "that's where [the supervisor's] responsibility would probably end" (Tr. 31).  When asked to identify specific expectations in the HCR job descriptions for supervisors, Barker was unable to identify any responsibilities requiring supervisors to ensure subordinates received meal breaks (Tr. 32–34).

England's testimony also supports Plaintiffs' claims.  When asked what instructions were given to managers or supervisors to monitor employees, England testified: "[T]hey were not provided, to my knowledge, any additional information other than the fact that each of our employees are entitled to a 30-minute uninterrupted meal break" (Creely Doc. No. 42 at Tr. 132).

These admissions by HCR are sufficient to support and advance Plaintiffs' claim that HCR facilities failed to ensure hourly employees were receiving their uninterrupted meal break in violation

27

of the FLSA, and that all hourly employees may be similarly situated with regard to HCR's corporate policy.

The plain language of the Department of Labor Fact Sheet discussing health care employers' use of auto-punch policies makes it clear the employer has some duty to "ensure" employees are receiving their meal breaks.  "When choosing to automatically deduct 30-minutes per shift, the employer *must ensure* that the employees are receiving the full meal break."  Dep't of Labor, Fact Sheet No. 53, at 3 (emphasis added).  The Department of Labor Fact Sheet also explicitly states that even when "the employer notifies employees of the [auto-deduct] policy and of their responsibility to take a meal break[,] . . . the employer *is still responsible for ensuring* that the employees take the 30-minute meal break without interruption."

Courts considering the issue of what is legally required under the Department of Labor's "must ensure" language have given mixed signals.  Some courts have indicated such claims are colorable, *Wolman v. Catholic Health Sys. of Long Island, Inc.*, 2011 WL 1741905, at *1 (E.D.N.Y. 2011), while others have cast doubt on whether such a claim will be meritorious.  *Frye v. Baptist Mem'l Hosp.*, 2010 WL 3862591, at *7 (W.D. Tenn. 2010).  Furthermore, to what extent and by what methods employers are expected to ensure employees are receiving their full meal breaks remains unclear, both under the Department of Labor's guidance and by courts that have considered the issue.  *See, e.g.*, *Kuznyetsov*, 2009 WL 1515175, at *5; *Camesi*, 2009 WL 1361265, at *4 ("The law is clear that it is the employer's responsibility, not its employees', to ensure compensation for work 'suffered or permitted.'") (citing *Chao v. Gotham Registry*, Inc., 514 F.3d 280, 288 (2d Cir. 2008)); *Brinker v. S.C.*, No. S166350, 85 Cal. Rptr. 3d 688 (Cal. 2008) (pending before the California Supreme Court,

in part, on the issue of whether an employer must simply make a provision for meal break or ensure employees receive meal breaks under similar California state laws).

However, the focus of this Court's inquiry at this point in considering conditional certification is "not on whether there has been an actual violation of law but rather on whether the proposed plaintiffs are similarly situated . . . with respect to their allegations that the law has been violated." *Brabazon*, 2011 WL 1131097, at *3 (quoting *Young v. Cooper Cameron Corp.*, 229 F.R.D. 50, 54 (S.D.N.Y. 2005)).  Because there is no clear answer on either the general question of what is required to "ensure" employees receive their breaks or whether HCR's specific implementation of the auto-deduct policy may or may not meet an as-yet-undefined standard, Plaintiffs have provided sufficient factual support to advance their allegations to the next stage.

### Other HCR Documents

The third major group of materials supplied by Plaintiffs are various HCR documents that describe the processes and procedures by which HCR implemented the auto-deduct policy.  Included in the collection of documents are training materials used by HCR regarding the auto-punch policy (Creely Doc. Nos. 49, 53–54, 56–57), policy handbooks (Creely Doc. Nos. 50–52), examples of punch forms (Creely Doc. No. 55 at 16–18), job descriptions (Creely Doc. Nos. 64–66), and cancelled punch log reports from the timeclock system that show when auto-deducted meal breaks have been cancelled for assorted HCR employees (Creely Doc. Nos. 60–61).

Several documents support Plaintiffs' contentions that employees were influenced or pressured in varying degrees to not turn in punch forms when the employees were unable to take a meal break.  One example document, entitled "RE: 'No Meal Break Taken' Policy," signed by Niccolynn Cross, an HCR employee not currently a plaintiff in this lawsuit, indicates that if the employee does not get

29

permission in advance before missing a meal break, that employee will be disciplined for requesting a cancellation of their automatic meal deduction (Creely Doc. No. 55 at 1).  Another document entitled, "Tardies/Missed Punches/FOBS," signed by Niccolynn Cross and an HR representative, indicates that if an employee submits three missed punch forms, that employee will be subject to a minor disciplinary action (*id.* at 2).  A third document, which appears to be a notice sent to the nursing staff, requires employees to obtain supervisory approval of a missed meal break at the time of the missed meal break (*id.* at 6).  Other policy documents indicate that "repeated missed lunches are not acceptable and should not occur without permission" (*id.* at 12–13).  While each of these documents includes an element of responsibility on the part of the employee with respect to not missing meal breaks, these documents also support Plaintiffs' allegations that employees were discouraged from submitting missed punch forms when they were unable to take an uninterrupted meal break and that employees would turn them in only if they were able to take no meal break at all.

Other documents submitted by Plaintiffs support a finding that HCR neither properly trained employees about their right to an uninterrupted break nor were supervisors ensuring employees received a break.  Director of Safety and HR Operations Support Hutchison discussed an HCR document (Creely Doc. No. 43 at Tr. 53–54) that misrepresented to employees their right to have an uninterrupted meal break under HCR's auto-deduct policy. Under the heading "Meal Breaks," employees were instructed if they work more than five hours per day, the employee is "allowed an unpaid thirty (30) minute meal break" (Creely Doc. No. 55 at 4).  In fact, employees were not simply "allowed" to take such a break but were expected and required to take such a break.  By choosing to implement the auto-deduct policy, HCR incurred the duty to ensure employees received uninterrupted meal breaks despite the standard provisions of the FLSA that do not require an employer to give

employees such meal breaks.  *See* Dep't of Labor, Fact Sheet No. 53, at 3 ("[T]he employer is still responsible for ensuring that the employees take the 30-minute meal break without interruption"); *see also Camesi*, 2009 WL 1361265, at *4.

While HCR maintains that Plaintiffs have not shown specific knowledge of other employees' experience (Creely Doc. No. 78 at 16–18), Plaintiffs have shown what may be significant shortcomings in the way HCR chose to implement its company-wide auto-deduct policy.  Plaintiffs are not also required to present some additional, unspecified number of affected employees in order to proceed to conditional certification.

Nor is this Court persuaded by HCR's argument that employees have successfully cancelled meal breaks over 840,000 times over the four-year period in question (*id.* at 22), thereby casting doubt on Plaintiffs' claims.  While HCR's quoted number appears impressive standing alone, viewing the 840,000 cancellations in context of all shifts worked accounts for less than 2% of the total shifts worked by the putative collective action members (Creely Doc. No. 79-1 at 6).  Without weighing the merits of the claims and evidence at this point in the litigation, a showing that fewer than 2% of hourly employees over the course of four years successfully cancelled a missed meal break is not so overwhelming as to defeat Plaintiffs' claim that a similarly situated class exists.

## II.    CONTEH V. ATRIUM CENTERS, ET AL.

### Introduction

Plaintiff Sandra Conteh worked as a Licensed Practical Nurse from September 2004 until November 2009 at the Darlington Nursing & Rehabilitation Center in Toledo, Ohio (Conteh Doc. No. 29 at 8).  The Darlington facility was operated by Defendants Atrium Centers, LLC ("Atrium"), and its operating groups Essex Group, and Orion Operating Services, LLC ("Orion"), which together

operate short-term medical care and rehabilitation and long-term skilled nursing care facilities in Ohio, Kentucky, Wisconsin, and Michigan (Conteh Doc. No. 23 at 3; Doc. No. 34 at 2).  Atrium and its operating companies operate roughly 45 facilities, each of which employs between 20 and 200 individuals (Conteh Doc. No. 29 at 2).  Management and policy development for all facilities is centralized at Atrium's corporate headquarters (*id.* at 3).  Atrium also utilizes two regional Human Resource Directors to administer HR policies and each individual facility has an on-site administrator (*id.*).

Atrium acquired 25 of its 45 facilities in 2007.  Those 25 facilities implemented an auto-deduct meal break policy that automatically deducted thirty minutes from employees' timecards when they worked a shift of more than five hours (*id.* at 4–5).  Approximately 1,600 employees were subject to the auto-deduct policy (*id.* at 5).

Conteh originally filed this suit in February 2010, on behalf of herself and other similarly situated hourly employees of Atrium, alleging Atrium violated the FLSA in the 25 Atrium facilities by not compensating hourly employees for all time worked due to the automatic deduction of meal break time (Conteh Doc. No. 1).  Conteh later filed two Amended Complaints (Conteh Doc. Nos. 2, 22).  The parties were granted approximately six months to conduct limited discovery on whether a group of similarly situated employees existed before proceeding with conditional certification of a collective action (Conteh Doc. Nos. 16, 24).

Conteh moved for conditional certification of a FLSA collective action in November 2010 (Conteh Doc. Nos. 28, 29).  Atrium opposed (Conteh Doc. No. 34) and Conteh replied (Conteh Doc. No. 37).  The Court heard oral argument in February 2011 (Conteh Doc. No. 42).

**Conteh's Allegations**

As discussed above with respect to the general standard to be applied in this case, the primary basis for Conteh's Complaint is Atrium's use of an auto-deduct policy to automatically deduct a thirty-minute meal break from hourly employees' timecards when an employee worked a shift of more than a certain length (the "Meal Break Deduction Policy") (Conteh Doc. No. 22 at 4).  Atrium implemented this policy through the use of two computerized timekeeping systems, Kronos and E-time, in 25 of its facilities and all Atrium non-exempt hourly employees are subject to the Meal Break Deduction Policy (*id.* at 5).  Conteh alleges the auto-deduct policy improperly and illegally shifts the burden to employees to ensure non-qualifying (i.e., meal breaks of less than thirty minutes or interrupted meal breaks) are not deducted from their pay (*id.*).  Conteh also alleges Atrium does not ensure hourly employees are completely relieved of their duties, thereby preventing employees from taking uninterrupted meal breaks as required by Department of Labor guidelines for employers that choose to implement an auto-deduct policy (*id.*).

Conteh makes three primary allegations regarding Atrium's corporate policies with respect to the proposed collective action (Conteh Doc. No. 29 at 2):

- Atrium improperly shifts the burden of monitoring compensable work time to hourly employees by requiring employees to attempt to cancel missed or interrupted meal breaks;

- Atrium fails to provide any instruction to employees or their supervisors as to what constitutes an uninterrupted meal break; and,

- Atrium does not provide any training or require supervisors to monitor if or when hourly employees receive an uninterrupted meal break despite Atrium's decision to implement the automatic thirty-minute deduction.

33

As discussed with respect to the Creely plaintiffs' claims above, Conteh's claims are focused on Atriums's method of *implementing* the policy, and are not the policy-to-violate-the-policy claims that have appeared in other FLSA cases. *See, e.g.*, *Saleen*, 2009 WL 1664451, at \*5. Accordingly, as above, this Court's review will focus on whether Conteh's top-down discovery approach has produced sufficient facts drawn from discovery at the Atrium corporate level, and not from other potentially affected employees, to advance her conditional collective action claims.

### Conteh's Factual Support

Conteh provides her own declaration and deposition testimony (Conteh Doc. Nos. 30-1, 30-5), along with deposition testimony from three Atrium Rule 30(b)(6) representatives (Conteh Doc. Nos. 30-2, 30-3, 30-4), and various Atrium internal documents (Conteh Doc. Nos. 30-6–30-18).

#### Conteh Testimony

Similar to the Creely plaintiffs, Conteh's own declaration and deposition testimony does little to advance her claims as the relevant content simply restates many of the same claims present in her Complaint. The simple claim that Conteh and other hourly employees were subject to an auto-deduct policy is not sufficient standing alone for conditional certification. Conteh's declaration does add however that she personally observed other hourly employees who worked through their meal breaks or were interrupted during their meal breaks. While of questionable admissibility, these personal observations in support of the Complaint's allegations can be considered as supportive, but not sufficient, to conditionally certifying the collective action. *See Carter*, 2011 WL 1256625, at \*16–17.

#### Deposition Testimony

Three corporate representatives testified on behalf of Atrium:

- Keith Yoder, Chief Financial Officer ("CFO");

34

- Dennis Lockhart, Controller; and,

- Susan Kreuser, Vice President of Human Resources.

The testimony of each individual advances Conteh's allegations.

Keith Yoder, as CFO, testifying with regard to Atrium's corporate auto-deduct policy as it applied to the 25 facilities at issue, confirmed the implementation of the policy at the facilities (Conteh Doc. No. 30-2 at Tr. 61–64). Yoder was able to generally describe the policy and where it was documented, yet was unable to address even the basics of the procedures about how an employee could cancel the auto-deduction (Tr. 91). Yoder did confirm that, in implementing the auto-deduct policy, no records were kept on whether employees were actually taking thirty-minute uninterrupted meal breaks (Tr. 97).

While there was an unrecorded in-service training session for supervisors and employees, the Atrium employee handbook and policy manual were not updated to reflect the use of the auto-deduct policy (Tr. 99–100). Yoder also indicated that despite the differences in payroll policies and procedures between those Atrium facilities that used the auto-deduct policy versus those that did not, no changes were made to the written policy documentation (Tr. 73–74).

Similarly, Dennis Lockhart, in his role as Atrium's controller and head of payroll (Conteh Doc. No. 30-2 at Tr. 44), provided additional support for Conteh's claims. Atrium's supervisors were not instructed or trained to track whether employees worked through their meal breaks, nor were employees provided any formal training on the auto-deduct policy (Conteh Doc. No. 30-3 at Tr. 28–35, 91). Atrium failed to provide guidance to employees as to what constituted an "uninterrupted meal break," as defined under the FLSA or to inform employees that they would be subject to an automatic thirty-minute deduction (Tr. 28–29) ("Q. [D]o you know whether any of these employee

35

manuals or handbooks ever instructed those employees on what it meant to actually get a 30-minute uninterrupted meal break? A. Other than stating that they are owed a 30-minute uninterrupted meal break, I'm not aware of any other."). Lockhart was also unaware whether there was any documentation instructing employees to fill out a Payroll Adjustment Form for a missed meal break, suggesting only that it might be in the HR policy manual or employee handbook (Tr. 29). There is, in fact, no such instruction in either document.

In addition, supervisors themselves might be working with the employee when the employee was working through his or her meal break (Tr. 93–94). This adds credence to Conteh's claims that not only did supervisors fail to ensure meal breaks were taken but in fact supervisors may have been aware meal breaks were not being taken despite the auto-deduct policy.

The testimony of Susan Kreuser provides yet more support to Conteh's allegations. When asked what training or documentation employees received about the auto-deduct policy, Kreuser indicated there was a one-page informational sheet on meal breaks included in the employee's orientation packet (Conteh Doc. No. 30-4 at Tr. 17–20). As it turns out, this one-page sheet makes no mention of the auto-deduct policy, provides no guidance that the employee is entitled to an uninterrupted meal break or what constitutes an uninterrupted meal break, nor does the sheet provide instructions on how to go about cancelling the automatic deduction -- in essence, supporting all three of Conteh's primary allegations (Conteh Doc. No. 30-16). Kreuser also confirmed that there were no "across-the-board presentations or seminars" to educate employees on the auto-deduct policy when it was implemented (Conteh Doc. No. 30-4 at Tr. 33).

***Conteh Submitted Documents***

While much of the documentation submitted by Conteh does little to support her allegations (payroll adjustment forms (Conteh Doc. No. 30-15), timeclock logs (Conteh Doc. No. 30-17), and various business formation documents for Atrium and its operating companies (Conteh Doc. Nos. 30-9, 30-10)), a few documents do support her claims.

First, the Atrium employee handbook distributed to all hourly employees was never updated to reflect the implementation of the auto-deduct policy and thus fails to alert employees as to the process that should be used to cancel an auto-deducted meal break (Conteh Doc. No. 30-18 at 15) (describing Rest and Meal Periods).  Additionally, the handbook fails to explain what constitutes an uninterrupted meal break.  These omissions lend some support to Conteh's claims that employees were not properly trained or fully informed about Atrium's auto-deduct policy.

Second, Atrium's human resources policy manual also fails to fully explain the auto-deduct policy, the requirements of uninterrupted meal breaks, and the procedures by which an automatically deducted meal break is cancelled (Conteh Doc. No. 30-14 at 153–55).  This policy manual, which was not generally available to employees, was the primary source of supervisor training materials, outside of undocumented individual communications or oral discussions (Conteh Doc. No. 30-4 at Tr. 32–33).

Unlike the employee handbook, the policy manual was updated to mention the existence of the auto-deduct policy in some facilities, but without identifying which facilities employ the policy (Conteh Doc. No. 30-14 at 153–55). Further, nowhere does the policy manual instruct Atrium's HR personnel or managers on the requirement to ensure hourly employees actually receive a break, nor does the manual provide guidance on the requirement that a meal break must be uninterrupted in order to qualify as a uncompensated meal break.  Even though the employee handbook and the policy

manual were the primary means to inform and train Atrium personnel (Conteh Doc. No. 30-2 at Tr. 85–87; Doc. No. 30-3 at Tr. 24–25), these documents reflect that managers and supervisors may not have been properly trained.

### Atrium Submitted Documents

Lastly, this Court is not swayed by Atrium's submission of thirty-five "happy camper" affidavits from employees at seven of Atrium's auto-deduct facilities (Conteh Doc. No. 35-5). The affidavits, all using substantially the same language, each state that the employee never had an issue with missing a meal or, in the event the employee did miss a meal break, the employee was able to fill out a payroll adjustment form to indicate they missed their break and were properly paid.

These affidavits are of little use at this juncture. Just as courts have not traditionally required a plaintiff seeking conditional certification to come forward with some threshold quantity of opt-in plaintiffs, *see Carter*, 2011 WL 1256625, at *16–17, it is no more helpful for the employer to round up a small sample of favorable statements from employees. Furthermore, Atrium's argument that such affidavits show Conteh's proposed class is unmanageable and overbroad also fails. While it is likely true that not all hourly employees will opt-in to the collective action, the Court's function at this stage of conditional certification is not to perform a detailed review of individualized facts from employees hand-picked by Atrium. Those questions of the breadth and manageability of the class are left until the second-stage analysis following the receipt of forms from all opt-in plaintiffs. *See O'Brien*, 575 F.3d at 584–85.

## CONCLUSION

At this stage, the Court is determining whether Defendants' employees were allegedly subject to a common practice which may have resulted in FLSA overtime violations. The proper inquiry is

simply "whether plaintiffs are similarly situated *with respect to their allegations that the law has been violated*." *Chowdhury*, 2007 U.S. Dist. LEXIS 73853, at *15.  Plaintiffs have submitted sufficient evidence to support and advance their allegations.  Therefore, the Motions for Conditional Certification are granted (Creely Doc. No. 35; Conteh Doc. No. 29).

Counsel are directed to submit within ten (10) days a joint letter to the Court describing the desired language of the opt-in notice to be delivered to the conditional collective action members, highlighting any disagreements on language requiring attention by the Court.

IT IS SO ORDERED.

   *s/ Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

June 9, 2011

39