IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Robert N. Creely, et al.,                                  Case No. 3:09 CV 2879

                            Plaintiffs,

                                                           MEMORANDUM OPINION
          -vs-                                             AND ORDER_____

HCR ManorCare, Inc., et al.,                               JUDGE JACK ZOUHARY

                            Defendants.


### INTRODUCTION

Before this Court are Plaintiffs' Motion for Final Certification (Doc. 223) of a class conditionally certified under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), and affiliated Defendants' Motion to Decertify the Conditionally Certified Class (Doc. 215). The Motions have been fully briefed (*see* Docs. 216, 224, 227 & 228). At issue is whether Plaintiffs are similarly situated with respect to Defendant HCR's (Defendant) implementation of a timekeeping policy that automatically deducted thirty minutes from timecards of hourly employees who worked more than a set number of hours (the "auto-deduct policy"). If Plaintiffs are similarly situated, this case may proceed as a collective action under the FLSA; if not, this Court must decertify the class.

### BACKGROUND

This Court discussed the factual background of this case extensively in its Memorandum Opinion and Order granting conditional certification (Doc. 100). *Creely v. HCR ManorCare Inc.*, 789 F. Supp. 2d 819 (N.D. Ohio 2011). For purposes of this decision, the following abbreviated background suffices.

Defendant is a nationwide provider of short- and long-term medical and rehabilitation care with more than three hundred facilities under several trade names, employing roughly 44,000 non-exempt hourly employees (meaning FLSA overtime requirements apply to them) (Doc. 78 at 5). Defendant's facilities are generally organized into two divisions -- assisted living and skilled nursing (*id.*).  The residents served and staffing needs at each facility vary as to contractual and legal requirements (*id.* at 6).  However, Defendant develops company-wide policies, including those relating to compensation and training, at its headquarters in Toledo, Ohio.  Each facility has a local management team and human resources support personnel responsible for implementing and complying with corporate policies (*id.*).

One of these company-wide policies is a requirement that hourly employees take daily, uncompensated meal breaks.  Defendant uses a computerized timekeeping systems, Kronos, to automatically deduct a thirty-minute meal period from hourly employee timecards when an employee works a shift of more than five or six hours (Doc. 35 at 12).  Under this system, employees clock in at the beginning of a shift and clock out at the end of a shift; they do not clock in and out for a meal break.  Until the spring of 2010, if an employee was unable to take an uninterrupted thirty-minute meal break, the employee was required to fill out a form ("missed punch form") and submit it to a manager, who would then sign it and submit it to payroll personnel.  Payroll personnel would then adjust the timecard to reverse the automatically deducted thirty minutes so the employee would be properly paid for all time actually worked (*id.* at 13).

Plaintiffs, non-exempt hourly workers at HCR facilities across the country, allege they were denied overtime wages in violation of the FLSA's minimum wage requirements due to Defendant's implementation of the auto-deduct policy (Doc. 17 at 13).  Plaintiffs do not argue the auto-deduct

2

policy is illegal, nor do they argue Defendant had an unofficial "policy to violate" its lawful policy. Rather, Plaintiffs allege employees subject to Defendant's uniform auto-deduct policy either missed or worked through meal breaks and were not paid for many of those breaks because (1) Defendant illegally shifted the burden of monitoring "compensable work time" to individual employees by (a) requiring employees to cancel the automatically deducted thirty minutes when they did not receive an "uninterrupted meal break" and (b) by not defining the term "uninterrupted meal break;" (2) Defendant took no affirmative measures to monitor whether Plaintiffs actually received their meal breaks; (3) Defendant failed to train or inform employees or management what to do if a meal break was missed or interrupted; and (4) Plaintiffs did not report missed or interrupted meal breaks because Defendant did not train them or discouraged them from doing so (Doc. 224 at 9).

This Court granted conditional certification to the class, finding Plaintiffs were similarly situated with respect to their allegations that Defendant's implementation of the auto-deduct policy violated the law (Doc. 100 at 38–39). Because the total size of this class could be greater than 44,000 employees, this Court and the parties agreed to send notice to a sample class of 3,239 current and former HCR employees from twenty-nine facilities located in twenty-eight states (*see* Doc. 119). Eventually, 318 current or former employees opted into this action. These opt-ins held various non-exempt, hourly positions at HCR facilities, and include registered nurses, licensed practical nurses, certified nursing assistants, and admissions coordinators.

Following the opt-in deadline, the parties conducted further discovery, which included the depositions of seventy-eight opt-in Plaintiffs and HCR human resource directors from twenty-six HCR locations across the country (Doc. 224 at 7). Discovery at this stage focused on whether Defendant's implementation of the auto-deduct policy was similar across all its facilities such that

3

Plaintiffs would be similarly situated with regard to a common FLSA-violating policy or practice. At the close of discovery, Plaintiffs moved for final certification of the class, while Defendant moved to decertify the class.

DISCUSSION

**FLSA Collective Action Certification**

The FLSA provides a private cause of action against an employer "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b).  Collective actions brought by employees under the FLSA require putative class members to opt into the action by giving their "consent in writing to become such a party," and are generally termed, the "class."  (Although a group of plaintiffs in a collective action under the FLSA is not technically a "class" as defined under Federal Civil Rule 23, for simplicity this Opinion uses the term "class" as a short-form reference to the putative group of opt-in plaintiffs in this proposed collective action.)  The statutory standard for bringing a collective action under the FLSA is that the opt-in plaintiffs are "similarly situated," which does not mean plaintiffs need to be identical, but does require a showing that opt-in plaintiffs are similarly situated to the lead plaintiffs.  *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 584 (6th Cir. 2009).

Traditionally, courts in the Sixth Circuit follow a two-stage certification process to determine whether a proposed group of plaintiffs is "similarly situated."  The first, or "notice" stage, takes place at the beginning of discovery with a focus on determining whether there are plausible grounds for plaintiffs' claims.  If so, plaintiffs are permitted to solicit opt-in notices, under court supervision, from current and former employees.  The second stage occurs after "all of the opt-in forms have been

4

received and discovery has concluded." *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006) (internal quotation and citation omitted).

True first stage review is "fairly lenient," requiring only that plaintiffs show a colorable basis for their claim that a class of similarly situated plaintiffs exists. *White v. MPW Indus. Servs., Inc.*, 236 F.R.D. 363, 366–67 (E.D. Tenn. 2006) (internal citations omitted); *Olivo v. GMAC Mortg. Corp.*, 374 F. Supp. 2d 545, 548 (E.D. Mich. 2004). However, first stage review may be more stringent depending on the particular circumstances of a case. For example, where some discovery has taken place, the court may require a proposed class of plaintiffs to make a "modest plus" factual showing that they are similarly situated to the named plaintiffs. *See Creely v. HCR ManorCare Inc.*, 789 F. Supp. 2d 819, 826–27 (N.D. Ohio 2011); *see also Pacheco v. Boar's Head Provisions Co.*, 671 F. Supp. 2d 957, 960 (W.D. Mich. 2009). Still, this enhanced first stage review is relatively lenient because the "body of evidence is necessarily incomplete." *Creely*, 789 F. Supp. 2d at 826.

Second stage review, however, is understandably more stringent as it occurs after discovery has been completed and requires the district court to "examine more closely the question of whether particular members of the class are, in fact, similarly situated." *Comer*, 454 F.3d at 547. At this point, the court considers all the evidence, in conjunction with the demographic data of the putative opt-in plaintiffs, to determine whether the assembled class may continue as a collective action or whether the putative class should be decertified, leaving plaintiffs free to pursue their claims individually. "[T]he question is simply whether the differences among the Plaintiffs outweigh the similarities of the practices to which they were allegedly subjected." *Monroe v. FTS USA, LLC*, 763 F. Supp. 2d 979, 994 (W.D. Tenn. 2011). The primary factors considered during second-stage analysis are: (1) the disparate factual and employment settings of the individual opt-in plaintiffs; (2) the various defenses

available; and (3) fairness and procedural considerations.  *Frye v. Baptist Mem'l Hosp., Inc.*, 2012 WL 3570657, at *3 (6th Cir. 2012); *O'Brien*, 575 F.3d at 584; *Olivo*, 374 F. Supp. 2d at 548 n.2 (citing *Vaszlavik v. Storage Tech. Corp.*, 175 F.R.D. 672, 678 (D. Colo. 1997)).  Although courts weigh these factors during second stage review, they must be mindful not to apply the even stricter requirements contained in Federal Civil Rule 23 that apply to class actions.  *See O'Brien*, 575 F.3d at 584–85.  For example, applying the predominance standard of Rule 23 would "undermine[] the remedial purpose of the collective action device."  *Id.* at 585–86.

### Implementation of the Auto-Deduct Policy

Under the FLSA, an employer who "establishes a reasonable process for an employee to report uncompensated work time" is "not liable for non-payment if the employee fails to follow the established process."  *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 876 (6th Cir. 2012).  Employees who do not follow a legitimate, reasonable process for reporting their time "prevent[] the employer from knowing its obligation to compensate the employee[s] and thwarts the employer's ability to comply with the FLSA."  *Id.*

That Plaintiffs were subject to an auto-deduct policy is undisputed.  Similarly undisputed is that such a policy, properly implemented, is lawful under the FLSA.  *Id.* at 873; *Frye*, 2012 WL 3570657, at *3.  Because this system requires employees to cancel a deduction if they work through a meal break, shifting the burden of monitoring missed meal breaks to the employees themselves, the auto-deduct policy standing alone "cannot form the basis of an alleged FLSA violation" under an improper burden-shifting theory.  *Frye v. Baptist Mem'l Hosp., Inc.*, 2010 WL 3862591, at *7 (W.D. Tenn 2010), *aff'd* 2012 WL 3570657 (6th Cir. 2012).  And Plaintiffs here do not assert that Defendant had a "policy to violate the policy."  Thus, the relevant inquiry at this final certification stage is

6

whether Defendant inadequately and unlawfully implemented its auto-deduct policy "across the board" creating a class of similarly situated Plaintiffs.

Plaintiffs claim that Defendant failed to inform employees of the policy's procedures, to properly train employees or managers on the policy, and actively discouraged employees from utilizing the remedial steps built into the policy. Plaintiffs also argue that any differences among them in job titles, responsibilities, and managers are immaterial because Defendant, through its decisions on how to implement the auto-deduct policy, ensured that employees and managers would not understand the policy or their rights. Defendant counters that its policy was reasonably implemented, that Plaintiffs generally were knowledgeable about and trained on the policy, and that Plaintiffs nonetheless failed to utilize proper procedures. Further, Defendant argues the policy was implemented by individual managers across each of its facilities. As such, any unlawful implementation of the policy at one facility is isolated and would not apply to all employees at all facilities.

This Court's role during second-stage review is not to assess the merits of Plaintiffs' FLSA contentions; rather, it is to determine whether the conditionally certified class remains similarly situated under heightened scrutiny. Evidence tending to support FLSA violations at one facility will not necessarily support maintaining the class unless there is some nexus between those apparent violations and Defendant's implementation of its policy as to all Plaintiffs. *See O'Brien*, 454 F.3d at 585 (noting that plaintiffs can be similarly situated when their claims are unified by a common theory of a defendant's liability). As discussed above, this Court determines whether Plaintiffs remain similarly situated by weighing the disparate factual and employment settings of the individual opt-in Plaintiffs, the various defenses available to Defendant with respect to individual Plaintiffs,

7

and fairness and procedural considerations.  This Court has reviewed the voluminous record submitted with this round of briefing, but shall limit its record references below to illustrative examples, in lieu of lengthy and repetitive string citations.

### *Varied Employment Settings Weigh Against Certification*

Opt-in Plaintiffs are or were registered nurses, licensed practical nurses, certified nursing assistants, and admissions coordinators employed by Defendant at facilities across the country. Defendant's auto-deduct policy applied to all of them, and they all testified that, at some point, they worked through their meal breaks and were not compensated for that work.  Many testified, with varying levels of specificity, that they were not properly trained or instructed on the auto-deduct policy or the term "uninterrupted meal break."  For example, Plaintiffs point to an extensive collection of opt-in testimony stating they received minimal training on the policy or that any training was limited to a discussion during orientation (Doc. 224 at 11–12 & nn.3–4; Doc. 228 at 20–22).  In addition, even some opt-in Plaintiffs with supervisory responsibilities (*e.g.*, Brooks) testified they were not trained to ensure employees either received their breaks or were compensated for missing them (Doc. 224 at 13).  Beyond this asserted lack of training, Plaintiffs cite the testimony of several opt-in Plaintiffs stating their managers discouraged or prohibited them from submitting a missed punch form when they worked through a meal break (*id.* at 15–17).

Plaintiffs further allege the inadequate training was not limited to Plaintiffs; rather, they argue the managers, whose job it was to implement the policy, also received inadequate training (Doc. 224 at 18–21).  They point to testimony from some HCR facility supervisors and human resources managers indicating confusion on what "uninterrupted" meant with regard to meal breaks, as well as testimony that HCR did not have a policy requiring managers to monitor employees' meal breaks

8

(*id.*).  Much of this testimony was expected, given the testimony of HCR's corporate designee during the conditional certification stage that HCR did not define the term "uninterrupted meal break" for its employees.  *See Creely*, 789 F. Supp. 2d at 834.  Further, some managers testified they did not actively monitor whether Plaintiffs worked through any meal breaks (*id.*).  Plaintiffs assert that HCR's lack of vigilance and involvement in the implementation of its auto-deduct policy at the local level is the common theory of a FLSA violation that binds all Plaintiffs.

In response, Defendants allege Plaintiffs overstate the record, and point to distinctions among Plaintiffs' testimony and inconsistencies within individual Plaintiffs' testimony.  At the heart of many of these distinctions is the localized nature of Defendant's implementation of the auto-deduct policy.  Most of the deposed Plaintiffs indicated they received some training on the auto-deduct policy and, specifically, what to do if they worked through a break; were informed of the policy during orientation; and signed forms acknowledging their receipt and understanding of the policy (*see* Doc. 216 at 12–13; Docs. 217-2 & 217-4; Doc. 227 at 8 n.19).  Many also testified they understood the policy, knew they were entitled to a thirty-minute uninterrupted break, and knew they were supposed to submit a missed punch form if they worked through all or part of their meal break (Doc. 227 at 6–9).  Indeed, many witnesses who testified they received inadequate training on the policy also testified, for example, that they received additional training from their managers on the auto-deduct policy and the use of a missed punch form (*e.g.*, Mason, D'Angelo), and that they were aware their thirty-minute break was to be uninterrupted (*e.g.*, Bustos, Colston).

Defendant also relies on testimony indicating that Plaintiffs' ability to take uninterrupted breaks depended on their particular facility, unit, shift, patient population served, job duties, and individual habits (Doc. 216 at 27–32).  In some facilities and in some units, for example, meal breaks

9

were pre-scheduled depending on an employee's job duties (Doc. 227 at 24 n.64).  Given these variables, Defendant argues the class cannot be similarly situated because Plaintiffs' ability to take breaks, and Defendant's knowledge (if any) of Plaintiffs' missed breaks depended on individual circumstances not representative of the class.

In addition, testimony regarding managers either discouraging or preventing Plaintiffs from submitting missed punch forms does not appear universal across all managers and all HCR facilities. While many Plaintiffs testified they felt discouraged from submitting the forms, many others testified they were never discouraged from doing so and in some cases were encouraged to fill out the missed punch forms (Doc. 227 at 24–25 nn.65–71).  In addition, several of the managers alleged to have discouraged Plaintiffs from submitting the forms dispute those accounts in their own depositions or declarations (*see* Doc. 216 at 35, 48–50), so it is not clear from the record whether these Plaintiffs in fact were discouraged from submitting missed punch forms.  Defendant argues this diverging testimony will require individual credibility determinations not suitable for a collective action.

Also, much of the documentary evidence supports Defendant's contention that, from the corporate level, the policy was implemented lawfully.  For example, HCR's policy was contained in the Employee Handbook, which provides: "Occasionally, you will be unable to take a meal break or will be interrupted for an emergency.  When this happens, you must inform your supervisor that you were unable to take the scheduled meal break" (Doc. 217-1).  Likewise, the policy was fully explained in HCR's Human Resources Policy and Procedures Manual, although this was not widely distributed among employees outside of human resources (Docs. 47–48).  Defendant also provided employees (though it is unclear how many) with documents entitled "Employee Guidelines for Time Record Keeping" (Doc. 217-3), and a "Letter of Understanding" (Doc. 217-4).  The Letter of Understanding,

10

which some employees signed, provides "I understand a 30-minute meal break will be deducted for every shift I work over five hours.  I will notify my supervisor and complete the proper paperwork for any occasion where I do not receive my full meal break."  It remains unclear, though, how many of the potential opt-in class received these documents.  Looking only to the deposed opt-in Plaintiffs, forty-six acknowledged receiving the Handbook, twenty-eight acknowledged receiving the Letter of Understanding, and nine acknowledged receiving the Employee Guidelines (*see* Doc. 217-2 (summarizing meal break policy acknowledgments)).  Still, these documents reflect a corporate-wide position to implement and enforce the auto-deduct policy lawfully.

While there always will be individualized proofs in a collective action, and the mere existence of individualized proofs is not sufficient reason for decertification, the varying accounts among these witnesses and indeed within individual witness testimony weighs against final certification.  Yes, all Plaintiffs were subject to the auto-deduct policy, but the application of the policy varied based on several factors, including job duties and individual managers at the various HCR facilities.  Some managers were more involved than others in implementing the policy.  For example, while some managers provided follow-up training to Plaintiffs, others are accused of actively discouraging Plaintiffs from submitting missed punch forms.  What is apparent from the record here is that Plaintiffs' knowledge of and training on the policy, and the application of the auto-deduct policy itself, varied in large part depending on the individual managers at Defendant's facilities.

Several courts have decertified classes that exhibited these types of factual distinctions among a class of plaintiffs.  For example, in *Frye v. Baptist Mem'l Hosp., Inc.*, 2010 WL 3862591 (W.D. Tenn 2010), *aff'd* 2012 WL 3570657 (6th Cir. 2012), the court decertified an auto-deduct class where a defendant implemented its auto-deduct policy on a facility-by-facility basis where only three

11

facilities were involved. *Id.* at *3–4. The court noted that each facility "maintained its own finance and human resources functions," that tracking employee time was left to the employees themselves, and that the defendant did not monitor its employees' compliance with the meal break policy. *Id.* at *8. Further, the court found that the plaintiffs' job duties varied significantly among the two hundred departments contained in the three facilities. *Id.* These factual distinctions all weighed against final certification.

Similarly, in *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 2011 WL 6372873 (W.D. Penn. 2011), the court decertified a class of employees who were subject to an auto-deduct policy. There, the policy was implemented in a decentralized manner, and there were numerous differences among opt-in plaintiffs, including different job titles and responsibilities, and hundreds of different supervisors to whom they reported. *Id.* at *7–8. The court there found that differences in job duties "[we]re highly relevant to their claims that they worked during meal breaks without compensation because their job duties dictated whether and why they experienced missed or interrupted meal breaks." *Id.* at *8 (citing *White v. Baptist Mem'l Health Care Corp.*, 2011 WL 1883959, at *7 (W.D. Tenn. 2010), *aff'd* 699 F.3d 869 (6th Cir. 2012)).

Another example is *Kuznyetsov v. W. Penn Allegheny Health Sys., Inc.*, 2011 WL 6372852 (W.D. Penn. 2011), in which the court decertified a class of 806 plaintiffs that held many different job titles, had varying duties, and worked for hundreds of different supervisors. *Id.* at *5–6. The court noted that job duties were relevant to "how, why and whether the employees were compensated properly for missed or interrupted meal breaks," and that the application of the auto-deduct policy "differed based on a number of factors, not the least of which was based on the nature of the jobs performed by Plaintiffs, the departments in which Plaintiffs worked, the supervisors' procedures, and

12

the shifts the Plaintiffs worked." *Id.* The court noted that while job duties need not be identical, "substantial diversity" among the plaintiffs weighed against certification. *Id.* In addition, the court found that supervisors "would dictate how and when or if meal breaks were scheduled and the method of reporting a missed meal break," and would most likely know if any employee reported a missed break. *Id.* The heavy involvement of supervisors in the implementation of the auto-deduct policy "exponentially compound[ed] the differences and individualized experiences that go to whether there was a violation of the law, rather than creating consistency." *Id.*

Likewise, several other courts have decertified classes where company-wide policies were implemented in a decentralized manner. *See Blaney v. Charlotte-Mecklenburg Hosp. Auth.*, 2011 WL 4351631, at *7–8 (W.D.N.C. 2011) (decertifying a class where implementation of the common policy was "actually left to the centralized discretion of individual units and . . . management staff" and noting "[w]hen alleged FLSA violations stem from the enforcement of decisions of individual supervisors, without a company-wide policy or plan directing those enforcement decisions, collective treatment is not appropriate"); *Reed v. Cnty. of Orange*, 266 F.R.D. 446, 450 (C.D. Cal. 2010) (noting "[d]ecertification is appropriate where plaintiffs are subject to varying work conditions in different work locations or under different supervisors," and holding "the disparity between plaintiffs' factual and employment settings as to . . . their meal breaks result[ed] in highly individualized questions of fact that ma[de] proceeding as a collective action impractical and prejudicial to the parties").

Plaintiffs argue other cases, including one from this District, compel certification. These cases are not persuasive. In *Berger v. Cleveland Clinic Found.*, 2007 WL 2902907 (N.D. Ohio 2007), the court certified a class where opt-in plaintiffs, performing different job duties, were subject to the same meal break policy. The major distinction between *Berger* and this case, however, is that all plaintiffs

13

in *Berger* worked at the same facility.  *Id.* at *1–2.  The court there found that "all members of each position worked in the same department within the same building, had the same supervisor, and their job duties overlapped significantly."  *Id.* at *21.  *Berger* is thus unlike this case, which involves thousands of employees at dozens of facilities and hundreds of individual managers.

Plaintiffs also direct this Court to two cases from the Northern District of New York that granted final certification to large classes of plaintiffs who reported to large numbers of supervisors.  *See Hamelin v. Faxton-St. Luke's Healthcare*, 274 F.R.D. 385, 395 (N.D.N.Y. 2011); *Colozzi v. St. Joseph's Hosp. Health Ctr.*, 275 F.R.D. 75, 85 (N.D.N.Y. 2011).  This Court disagrees with the reasoning of those cases, in part because they appear to discount the importance of (1) disparate factual employment settings of individual plaintiffs, and (2) how an auto-deduct policy's implementation may vary depending on the managers who implement them.  In any event, they are not controlling on this Court.

Previously, this Court appropriately took Plaintiffs' statements at face value, when there were fewer apparent and minor differences among Plaintiffs, and conditionally certified this class.  Now, however, Defendant has demonstrated inconsistencies among and within opt-in Plaintiffs' testimony.  While the record is perhaps indicative of individual FLSA violations, the evidence as a whole does not demonstrate "similarly situated plaintiffs experiencing a common FLSA injury."  *See Frye*, 2012 WL 3570657, at *5.  The factual variations among individual Plaintiffs and among facilities weigh heavily in favor of decertification.

### *The Defenses Available to Defendant Vary Based on Individual Plaintiffs*

This Court next must assess the defenses available to Defendant and determine whether they are individualized as to each Plaintiff or can be asserted more broadly against a class.  *Frye*, 2010 WL

14

3862591, at *8–9; *Kuznyetsov*, 2011 WL 6372852, at *6.  "Where plaintiffs' factual and employment settings are similar, these defenses do not necessarily render collective treatment unmanageable." *Frye*, 2010 WL 3862591, at *9.  However, where plaintiffs have disparate factual and employment settings, as they do here, defenses likely will be individualized, rendering collective treatment inappropriate.

Defendant argues its defenses in this case are as disparate as each Plaintiff's experience and that this consideration weighs in its favor.  For example, in defending this matter, Defendant claims it will need to inquire into each Plaintiff's knowledge of the meal break cancellation policy, whether and how often each Plaintiff worked through or was interrupted during a meal break, whether each Plaintiff submitted missed punch forms and, if so, whether they were compensated.  Similar to *Kuznyetsov*, the "knowledge and testimony of each individual manager will be highly relevant and necessary" to the defenses Defendant may assert.  Testimony from managers regarding, for example, actual or constructive knowledge that a Plaintiff worked through a meal break without compensation, and the actual training provided to a Plaintiff regarding the auto-deduct policy, will be especially relevant because of the decentralized implementation of the auto-deduct policy.  *See Camesi*, 2011 WL 6372837, at *9.

This Court finds individualized defenses would overwhelm any trial of this case as a collective action, and accordingly finds this consideration too weighs against certification.

### Collective Treatment of the Claims Would be Unfair and Unmanageable

The final consideration is whether continuing to proceed collectively is fair, procedurally manageable, and in accord with the "broadly remedial and humanitarian" purposes of the FLSA. *Frye*, 2010 WL 3862591, at *9.  This Court must balance the reduced litigation costs to individual

15

Plaintiffs with the potential effects that final certification may have on the fairness of the adjudication and the interests of manageability and judicial efficiency. *Id.* (citing *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989)). Because it is a remedial statute, the FLSA must not "'be interpreted or applied in a narrow, grudging manner.'" *Id.* (quoting *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 144 (6th Cir. 1977)).

Although this Court is sympathetic to Plaintiffs' argument regarding the desirability of pooling resources to seek vindication of their FLSA rights and the remedial nature of the FLSA, this argument does not outweigh the significant factual differences here. Despite the fact that Defendant's auto-deduct policy applied to all Plaintiffs, Plaintiffs' right to compensation hinges on their individual experiences. It is unclear how proceeding collectively and using representative testimony would be fair or useful. For example, this Court does not find that representative testimony from licensed practical nurses in one location would necessarily be representative of individuals who held even the same position in another location. These individuals had different experiences and worked under different managers who may have implemented Defendant's policy in different ways.

Although courts look favorably upon partial as opposed to wholesale decertification, Plaintiffs here fail to offer a meaningful way to partially decertify the class, so even though that may be a favored result, it is not apparent how it would be done. *See Camesi*, 2011 WL 6372837, at *9. For example, the primary difficulty in producing representative testimony here would not be resolved by certifying sub-classes based on job descriptions because Defendant's implementation of its policy was done through individual managers on a decentralized basis, and was also dependent on the nature of the resident population at the individual facilities. In any event, Plaintiffs have failed to suggest how this could be accomplished in a just manner.

16

**CONCLUSION**

In sum, this Court finds Plaintiffs failed to present substantial evidence they are similarly situated with respect to Defendant's implementation of its auto-deduct policy.  The record shows a variety of factual and employment settings among the individual Plaintiffs and the actions of hundreds of managers who actually implemented Defendant's policy.  As a result, the defenses are individualized, and it would be unfair and impractical, to both sides, to have representative testimony presented for the proposed class when any one Plaintiff's situation is potentially markedly different from another's.  Representative evidence simply will not work under these facts.  Certification here would hinder, not promote, judicial economy.  Accordingly, Plaintiffs' Motion to Certify (Doc. 223) is denied, and Defendants' Motion to Decertify (Doc. 215) is granted.  The claims of all opt-in Plaintiffs are dismissed without prejudice.

IT IS SO ORDERED.

_____s/ *Jack Zouhary*_____
JACK ZOUHARY
U. S. DISTRICT JUDGE

January 31, 2013

17